# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SCOTT SENSENIG,** | : | **Civil No.  3:24-CV-00170** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LELAND DUDEK,**[1] | : | |
| **Acting Commissioner of Social Security** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.    Introduction

In Scott Sensenig's case the Administrative Law Judge (ALJ) was confronted with a record marked by conflicts and contradictions. These conflicts were exemplified by the medical opinion evidence which presented a sweeping array of mutually inconsistent and irreconcilable views concerning the degree to which Sensenig's impairments were disabling. Ultimately the ALJ navigated this evidence by making a series of fact-bound determinations which led to the conclusion that

---

[1]Leland Dudek became the Acting Commissioner of Social Security on February 16, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for the previously named defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Sensenig retained the ability to perform a range of light work confined to simple tasks. Based upon this determination, the ALJ found that Sensenig was not disabled and denied his disability claim.

Sensenig now appeals this decision arguing that the ALJ erred in evaluating the severity of his symptoms, an error which led to an erroneous assessment of his residual functional capacity. Upon this backdrop, our review of this case is cabined and confined by the "substantial evidence" standard of review in Social Security cases, which is described by the Supreme Court in the following terms:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Under this standard of review, we are obliged to affirm the decision of the administrative law judge (ALJ) once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)).

Here, after a review of the record, although a court reviewing the evidence *de novo* could have reached a different conclusion on Sensenig's functional abilities, mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II. <u>**Statement of Facts and of the Case**</u>

### A. <u>**Background**</u>

The administrative record of Sensenig's disability application reveals the following essential facts: On August 6, 2021, Sensenig applied for disability and disability insurance benefits pursuant to Title II of the Social Security Act alleging an onset of disability beginning July 18, 2021. (Tr. 17).  According to Sensenig, he

3

was completely disabled due to the combined effects of obesity, degenerative disc disease of the thoracic and lumbar spine, COPD/asthma, hyperlipidemia, sleepwalking disorder, depression, anxiety, PTSD, and alcohol use disorder. (Tr. 19). Sensenig was born on December 25, 1980, and was 40 years old on the alleged disability onset date, which is defined as a younger individual under the Commissioner's regulations. (Tr. 28). He had a high school education and prior employment in a number of heavy, semi-skilled vocations. (Id.)

### A. **Sensenig's Clinical History**

The medical evidence following Sensenig's alleged onset date in July 2021 revealed that Sensenig, a veteran, received his primary physical and psychological health care through the Veterans Administration. (Tr. 303-1007). With respect to this treatment history, the ALJ aptly summarized Sensenig's largely unremarkable clinical record during the pertinent time frame as follows:

> On July 29, 2021, James Via, Psy.D., performed a telephone therapy family session with the claimant and his wife. The claimant reported no concerns regarding his mood with the exception of anxiety and frustration secondary to issue with his employer. Dr. Via noted the claimant's mood as mildly anxious and fully alert and oriented with fair insight and judgment and no signs of impaired thought process, thought content, or perceptual disturbance. On August 5, 2021, the claimant reported improvement in terms of anxiety with no recent anxiety attacks since increasing his buspirone dose (Exhibit 4F). On October 21, 2021, Dr. Via noted that the claimant was discharged from therapy. The claimant reported no alcohol use since August 13, 2021, with an intent

to remain sober. He also reported noticeable improvement with medication. Dr. Via noted the claimant's overall stability and that he made "significant progress" since starting treatment (Exhibit 5F).

On November 15, 2021, the claimant underwent trigger point injection (x4) in the left thoracic paraspinal muscle groups in the bilateral lumbar paraspinal muscle (Exhibit 7F).

On November 17, 2021, Karena Hammon, CRNP, performed a consultative physical examination of the claimant. She noted the claimant's history of degenerative disc disease with his October 2020 MRIs showing multi-level mild degenerative disc disease with no disc protrusion, no significant spinal canal, and no neural foraminal stenosis at the lumbar spine and multi-level neural foraminal stenosis at the thoracic spine. The claimant reported using pain medication daily, as well as the use of an H-wave device and a TENs unit. His weight was noted at 190 pounds. He presented with a normal, unassisted gait. He had no difficulty with walking on heels and toes but lost his balance with attempting tandem walk. He was able to squat 50% of full. He presented with mild kyphosis at the thoracic spine region. He had negative straight leg raising bilaterally both seated and supine. He presented with his joint stable and non-tender. He had normal reflexes, no sensory deficit, 5/5 strength throughout his upper and lower extremities, no evident muscle atrophy, intact hand and finger dexterity, 100% grip strength bilaterally, and no difficulty with fine or gross motor skills. He had decreased range of motion of the lumbar region with 70/90 degrees with flexion-extension and 10/20 degrees bilaterally with lateral flexion but with normal range of motion of all other areas tested (Exhibit 6F).

On December 8, 2021, the claimant was seen for a virtual/video medication management session. He reported doing well with anxiety well controlled but with worsening nightmares over the past month but sleeping well otherwise. He reported that he feels buspirone continues to be helpful. He presented with normal mental status examination findings. It was recommended that he continue buspirone and reduce Trazodone to 25mg nightly as needed, as it is possible the higher dose

was causing his reported nightmares (Exhibit 7F). On February 9, 2022, the claimant reported worsening sleep with the lower dose of Trazodone and returned to the 50mg dose. He reported ongoing nightmares but that he is getting restful sleep overall with resolution of parasomnias or sleepwalking due to remaining sober. He also reported that buspirone continues to help his anxiety. It was recommended that he begin a trial of low dose prazosin. However, prazosin was stopped due to side effects of palpitations and headaches (Exhibit 8F). On May 4, 2022, it was recommended that the claimant stop Trazodone and begin a trial of mirtazapine for anxiety and sleep. On July 6, 2022, it was recommended that the claimant stop mirtazapine and increase his dose of duloxetine back to 60mg due to reported weight gain, increased anxiety and restlessness at night (Exhibit 10F). On October 5, 2022, the claimant reported improvement in anxiety and irritability with the increased buspirone dose and denied any panic attacks. He also denied any concerns regarding depression. He reported that melatonin was somewhat beneficial for sleep but with waking up about four times a night, sometimes to use the bathroom but with no reason other times, and with difficulty falling back asleep. He also reported occasional difficulty with concentration but that it is manageable. The claimant was found to present with normal mental status examination findings. It was recommended that he continue buspirone, increase duloxetine to 90mg daily, and increase melatonin to 9mg as needed for sleep (Exhibit 11F).

On December 15, 2021, Dr. Raggi noted the claimant's reported complete relief of his upper lumbar and lower thoracic pain following the trigger point injections but with continued lower back pain, radiating to his lower extremities, worse on the left. He noted that the claimant had relief in his back pain for 2-3 months with prior medial branch blocks with corticosteroid. The claimant presented with 5/5 strength throughout and a normal gait. He had tenderness to palpation at the lumbar paraspinal muscle group, worse with lateral bending to the left. The claimant underwent lumbar epidural steroid injection at the L5-S1 level (Exhibit 7F).

Dr. Haverstick examined the claimant the following day. He noted the claimant's use of albuterol, once or twice daily with intermittent wheezing reported. He noted that the claimant continues to smoke 2-3 packs per day. The claimant reported eating more since he stopped drinking and was concerned about further weight gain should he quit smoking. His weight was noted at 189 pounds. He presented with a mild wheeze on forced expiration. Dr. Haverstick recommended that the claimant at Wixela, 1 inhalation twice daily, continue albuterol as needed, and work on smoking cessation. He also recommended further evaluation with pulmonary function testing. He noted the claimant's hyperlipidemia with an LDL of 212. He recommended that the claimant start Atorvastatin and referred him for a dietitian consult for diet recommendation and to help avoid weight gain with smoking cessation (Exhibit 7F).

The claimant's January 24, 2022 pulmonary function testing showed normal spirometry. His prebronchodilator therapy spirometry showed an FVC of 5.47, 115% of predicted, and an FEV1 of 4.09, 104% predicted. His DLCO was 70% of predicted but changed to 60% predicted when adjusted for alveolar volume. It was noted that the mild diffusion defect could be secondary to emphysema versus pulmonary vascular versus ILD (Exhibit 7F).

On March 9, 2022, Emeka Uzomah, DPM, and Samantha Banga, DPM, examined the claimant. They noted the claimant's history of bilateral flat foot. The claimant reported that his custom orthotics helped significantly but have become worn down. He had no other pedal complaints other than mild tenderness at the left foot secondary to an old injury. He presented with intact sensation at both feet and normal strength and range of motion. He presented with moderately decreased medial longitudinal arch bilaterally. He was casted for a new pair of custom orthotics (Exhibit 10F).

On March 20, 2022, Dr. Haverstick advised that the claimant's cholesterol was "at goal" with an LDL at 115 (Exhibit 10F). On May 11, 2022, Dr. Raggi noted that the claimant reported having relief for about one month following the lumbar epidural steroid injection but

gradually waned over the following two months. Dr. Raggi recommended that the claimant proceed with diagnostic medial branch blocks to determine his candidacy for radiofrequency ablation. The claimant underwent the medial branch blocks at L3-4 and L5 in addition to a trigger point injection at the thoracolumbar erector spinae muscle (Exhibit 10F). On August 4, 2022, the claimant underwent repeat medial branch blocks, L3-5 on the other side, but had severe pain with the first injection with lightheadedness. The other two injections were not performed though he did receive a trigger point injection at the left thoracic paraspinal muscles. His lightheadedness resolved spontaneously (Exhibit 10F)

(Tr. 22-24.)

## B. <u>Sensenig's Activities of Daily Living</u>

The evaluation of the severity of Sensenig's physical and mental impairments was further informed by his self-reported activities of daily living. Sensenig provided a description of these activities during his testimony at his November 29, 2022, disability hearing. At that time Sensenig explained that, notwithstanding his impairments, he could dress, shower, cook, shop, assist with dishes, and do some light yard work. (Tr. 39-41). Sensenig also reported that he assisted in caring for household pets and animals, could drive short distances, could climb stairs but not ladders, and could bend and touch his toes "when the pills are working." (Tr. 41-43).

### C. **The Medical Opinion Evidence.**

Given this clinical history, a number of medical sources opined regarding the degree to which Sensenig's physical and emotional impairments were disabling, reaching starkly differing conclusion on this issue. At the outset, two state agency experts, Dr. Ethel Hooper and Dr. George Ondis, evaluated Sensenig's physical and mental limitations in November of 2021. (Tr. 58-68). These state agency experts ultimately concluded that Sensenig could perform a range of light, unskilled work. (Tr. 66). While this initial evaluation determined that Sensenig experienced light to moderate limitations in meeting some of the mental demands of the workplace, (Tr. 61, 64-65), Dr. Ondis determined that:

> The claimant is capable of completing tasks within a schedule and at a consistent pace for routine and repetitive tasks. The claimant can make simple decisions for routine and repetitive tasks. The claimant is able to carry out short and simple instructions and some detailed tasks. The claimant is able to maintain concentration and attention for reasonably extended periods when performing simple and repetitive tasks, and some detailed tasks. The claimant would be able to maintain regular attendance and be punctual within reasonable expectations. The claimant would not require special supervision in order to sustain an ordinary routine when performing simple and repetitive tasks. Although some difficulty with stress tolerance is likely, the claimant would be expected to complete a normal week without exacerbation of psychological symptoms when performing routine and repetitive tasks.

(Tr. 64).

In April of 2022, a second set of state agency experts, Dr. Peter Garito and Dr. Kevin Hollick, conducted a second reconsideration examination of Sensenig's medical records. (Tr. 68-78). This second review reached similar conclusions finding that Sensenig could perform light work limited to simple tasks. (Id.)

A consulting examining source, Karena Hammon, N.P., reached somewhat different conclusions regarding Sensenig's residual functional capacity during a November 17, 2021, examination. (Tr. 690-99). N.P. Hammon reported that Sensenig had a normal gait; no difficulty with walking on heels and toes but lost his balance with attempting tandem walk; was able to squat 50% of full; had normal reflexes; no sensory deficit; 5/5 strength throughout his upper and lower extremities; no evident muscle atrophy; intact hand and finger dexterity; 100% grip strength bilaterally; and no difficulty with fine or gross motor skills. (Id.) Nonetheless she assessed that Sensenig could perform less than light work due to his chronic back pain. (Id.)

These findings, in turn, were at odds with the results of a functional capacity evaluation conducted by Phoenix Physical Therapy in October of 2022. (Tr. 1008-18). After a thorough examination, that assessment concluded that: "Sensenig demonstrated the ability to perform within the MEDIUM Physical Demand Category

based on the definitions developed by the US Department of Labor and outlined in the Dictionary of Occupational Titles." (Tr. 1008).

Finally, Dr. Charles Haverstick, Sensenig's primary treating physician at the VA provided several, somewhat enigmatic, evaluations of his capabilities. Initially, in July of 2021, Dr. Haverstick seemed to report that Sensenig could perform a maximum of eight hours of work with "intermittent bending per day." (Tr. 321). Later, in November of 2022, Dr. Haverstick submitted a second RFC evaluation, which was echoed by another treating source, Dr. Eugene Raggi. (Tr. 1019-26). In these reports, Dr. Haverstick and Dr. Raggi adopted and endorsed the findings of Phoenix Physical Therapy that Sensenig could perform medium work, while also stating that such work might exacerbate his anxiety and depression. (Id.)

It was against this medical background that Sensenig's case came to be considered by the ALJ.

### D. **The ALJ Decision**

A hearing was conducted in Sensenig's case on November 29, 2022, at which Sensenig and a vocational expert testified. (Tr. 35-56). In his testimony, Sensenig described his activities of daily living. (Tr. 39-41). According to Sensenig he could dress, shower, "randomly" cook, occasionally go shopping, sweep floors, do laundry with assistance, take out trash, help with yard work, care for pets, and drive short

distances. (Id.) Sensenig also acknowledged the ability to bend and touch his toes when his medication was working. (Tr. 41-42). Sensenig stated that he could climb stairs, but not ladders, and indicated that he assisted his wife in cleaning out horse and goat stalls. (Tr. 42-43). Sensenig also reported that he typically napped in the afternoons, (Tr. 44), but admitted that his medications "sporadically" helped to mitigate his symptoms. (Tr. 45).

Following this hearing, on December 20, 2022, the ALJ issued a decision in Sensenig's case. (Tr. 14-31). In that decision, the ALJ first concluded that Sensenig met the insured requirements of the Act through December 31, 2026, and had not engaged in substantial gainful activity since the alleged onset date of July 18, 2021. (Tr. 19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Sensenig had the following severe impairments: obesity, degenerative disc disease of the thoracic and lumbar spine, COPD/asthma, hyperlipidemia, sleepwalking disorder, depression, anxiety, PTSD, and alcohol use disorder. (Id.)

At Step 3, the ALJ determined that Sensenig did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 19-21). Between Steps 3 and 4, the ALJ then

fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Sensenig's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except occasional climbing of ladders, ropes, or scaffolds, balance, and stoop, avoid exposure to vibration, irritants, and hazards, such as heights and machinery, individual can understand and carry out simple routine repetitive tasks and can sustain attention for period of 2-hour segments while maintaining regular attendance and being punctual within customary limits and involving only simple work related decisions with few, if any, work place changes, and no interaction with the public.

(Id.)

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Sensenig's self-described limitations. (Tr. 22-28). The ALJ first engaged in a two-step process to evaluate Sensenig's alleged symptoms, finding that, although the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 22).

In making this determination, the ALJ considered Sensenig's statements and testimony, along with his spouse's statements regarding his impairments and limitations but noted that Sensenig's longitudinal medical evidence of record did not

support his allegations concerning the intensity, persistence, and limiting effects of his symptoms. (Tr. 22-24).

The ALJ also considered the medical opinion evidence. The ALJ found the opinions of the State agency medical consultants as amended and revised at the reconsideration level, persuasive. With respect to Sensenig's ability to meet the mental demands of the workplace the ALJ observed that:

> On November 1, 2021, George Ondis, Ph.D., the State agency psychological consultant, assessed the claimant's functional abilities: he has no limitation in his ability to understand, remember, or apply information or interact with others. He has a mild limitation in his ability to concentrate, persist, or maintain pace and adapt or manage himself. He has a moderate limitation in his ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. The claimant is capable of completing tasks within a schedule and at a consistent pace for routine and repetitive tasks. The claimant can make simple decisions for routine and repetitive tasks. The claimant is able to carry out short and simple instructions and some detailed tasks. The claimant is able to maintain concentration and attention for reasonably extended periods when performing simple and repetitive tasks, and some detailed tasks. The claimant would be able to maintain regular attendance and be punctual within reasonable expectations. The claimant would not require special supervision in order to sustain an ordinary routine when performing simple and repetitive tasks. Although some difficulty with stress tolerance is likely, the claimant would be expected to complete a normal week without exacerbation of psychological symptoms when performing routine and repetitive tasks. He has a moderate limitation in his ability to interact

appropriately with the general public but has the ability to maintain socially appropriate behavior within reasonable standards and can perform the personal care functions needed to maintain an acceptable level of personal hygiene within reasonable expectations. The claimant has the ability to get along with others reasonably well, ask simple questions, and accept instruction/advice. He has a moderate limitation in his ability to respond appropriately to changes in the work setting but is capable of taking appropriate precautions to avoid hazards. Although his stress tolerance is likely to be somewhat limited, the claimant can function in production-oriented tasks that require simple decision-making. Although he may have some difficulty adjusting to sudden and unexpected changes, the claimant can sustain an ordinary routine and adapt to routine changes without special supervision (Exhibit 2A). On April 5, 2022, Peter Garito, Ph.D., another State agency psychological consultant, assessed the claimant's functional abilities upon reconsideration review. He concurred with Dr. Ondis' November 2021 opinion (Exhibit 3A). These assessments are persuasive as to the State agency consultants' opinions of the claimant's function-by-function abilities and limitations, which they fully supported, noting the claimant's clinical history and mental status examination findings. However, the undersigned finds that the above opinions specific to the "paragraph B" criteria are not persuasive in this case, as the record as a whole, indicates that the claimant has moderate limitations, as set forth in detail above. The above function-by-function assessments though are consistent with the claimant's treatment notes of record including the additional evidence received at the hearing level, which shows that the claimant has had an overall stable psychiatric presentation (Exhibits 10F and 11F).

(Tr. 25-26).

The ALJ also found that the state agency expert opinions concerning Sensenig's physical abilities to be persuasive, stating that:

On November 30, 2021, Ethel Hooper, MD, the State agency medical consultant, assessed the claimant's functional abilities: he can lift

and/or carry twenty pounds occasionally and ten pounds frequently. He can stand and/or walk for six hours in an eight-hour workday. He can sit for six hours in an eight-hour workday. He can no postural, manipulative, visual, communicative, or environmental limitations (Exhibit 2A). On April 14, 2022, Kevin Hollick, DO, another State agency medical consultant, assessed the claimant's functional abilities upon reconsideration review: he can lift and/or carry twenty pounds occasionally and ten pounds frequently. He can stand and/or walk for six hours in an eight-hour workday. He can sit for six hours in an eighthour workday. He can climb ladders, ropes, or scaffolds, balance, and stoop occasionally. He has no manipulative, visual, or communicative limitations. He should avoid concentrated exposure to vibration, fumes, odors, dusts, gases, poor ventilation, and hazards, such as machinery and heights (Exhibit 3A). These opinions are persuasive. As State agency consultants, Dr. Hooper and Dr. Hollick reviewed the claimant's available treatment records prior to rendering their opinions, which they fully supported with objective findings. However, Dr. Hollick's opinion upon reconsideration review, which indicates that the claimant has additional postural and environmental limitations is consistent with the additional evidence received at the reconsideration level. The State agency consultants' opinions that the claimant is able to perform work within the light exertional level with additional non-exertional limitations, as indicated by the review at the reconsideration level, are also consistent with the additional medical evidence of record received at the hearing level, showing overall stable findings (Exhibit 10F).

(Tr. 26-27).

The ALJ also concluded that these state agency opinions regarding Sensenig's physical abilities were congruent with the October 2022, evaluation conducted by Phoenix Physical Therapy, whose findings had been concurred in by Sensenig's treating physicians, "as it indicates that he is able to perform work within the light

16

exertional level with additional non-exertional limitations." (Tr. 27). The ALJ found, however, that: "the finding of Dr. Haverstick and Dr. Raggi regarding the claimant's ability to maintain attention and concentration is not consistent with the record as a whole, including the claimant's own reported ability to perform daily tasks." (Id.)

Having made these findings, the ALJ concluded that Sensenig was unable to perform his past relevant work but retained the ability to perform other jobs that existed in significant numbers in the economy. (Tr. 28-29). Accordingly, the ALJ denied Sensenig's claim of disability. (Id.)

This appeal followed. (Doc. 1). On appeal, Sensenig argues that the ALJ erred in evaluating the severity of his symptoms, an error which led to an erroneous assessment of his residual functional capacity. However, after a review of the record, we find that substantial evidence supported the ALJ's decision in this case and therefore will affirm the decision of the Commissioner.

## III.  **Discussion**

### A.  **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200

(3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012).

Substantial evidence "does not mean a large or considerable amount of evidence, but

rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988).  Substantial

evidence is less than a preponderance of the evidence but more than a mere scintilla.

<u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not

substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir.

1993). But in an adequately developed factual record, substantial evidence may be

"something less than the weight of the evidence, and the possibility of drawing two

inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>,

383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

<u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

      The Supreme Court has recently underscored for us the limited scope of our

review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——,

135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.    <u>Initial Burdens of Proof, Persuasion, and Articulation for the ALJ</u>

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); <u>see also</u> 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role

and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations

23

that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12,

2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.     Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. See Diaz v. Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir.1994) (citing Stewart v. Sec'y of Health, Education and Welfare, 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. Ray v. Astrue, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 409 (3d Cir. 1979); accord <u>Snedeker v. Comm'r of Soc. Sec.</u>, 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; <u>Schaudeck v. Comm'r of Social Security,</u> 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

<u>McKean v. Colvin</u>, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015)(footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is

not required to credit them." <u>Chandler v. Comm'r of Soc. Sec.</u>, 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." <u>Hantraft v. Apfel</u>, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings,

28

diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D.Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted

sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019);Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

### D.    The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Sensenig retained the residual functional capacity to perform a range of light work with additional postural limitations. Therefore, we will affirm this decision.

In this case, Sensenig advances a twofold argument, asserting that the ALJ erred in evaluating the severity of his symptoms and in formulating an RFC for the plaintiff. However, our independent review of the record confirms that substantial evidence supported the RFC fashioned by the ALJ in this case. Indeed, with respect

to his physical limitations, the ALJ's decision aligned with the opinions of the State consultative examiners whose opinions he found persuasive, as well as the opinion of Phoenix Physical Therapy, which was endorsed by Sensenig's treating physicians. All of these opinions found that Sensenig could, at a minimum, perform light work. This medical opinion consensus was also supported by the longitudinal medical records and was congruent with Sensenig's self-described activities of daily living. On this score, Sensenig explained that, notwithstanding his impairments, he could dress, shower, cook, shop, assist with dishes and do some light yard work. (Tr. 39-41). Sensenig also reported that he assisted in caring for household pets and animals, could drive short distances, could climb stairs but not ladders, and could bend and touch his toes "when the pills are working." (Tr. 41-43). While Sensenig argues that the RFC also needed to take into account his reports of frequent napping, given the clinical record—which noted that Sensenig merely stated that "every once in a while [he] takes a nap" (Tr. 981)—the ALJ was justified in declining to factor routine naps into this RFC. Simply put, substantial evidence supported the physical RFC fashion by the ALJ in this case. There was no error here.

Likewise, Sensenig's simple tasks mental RFC was supported by substantial evidence including the only fully formed medical opinion to address his ability to meet the emotional requirements of work, which stated that:

31

The claimant is capable of completing tasks within a schedule and at a consistent pace for routine and repetitive tasks. The claimant can make simple decisions for routine and repetitive tasks. The claimant is able to carry out short and simple instructions and some detailed tasks. The claimant is able to maintain concentration and attention for reasonably extended periods when performing simple and repetitive tasks, and some detailed tasks. The claimant would be able to maintain regular attendance and be punctual within reasonable expectations. The claimant would not require special supervision in order to sustain an ordinary routine when performing simple and repetitive tasks. Although some difficulty with stress tolerance is likely, the claimant would be expected to complete a normal week without exacerbation of psychological symptoms when performing routine and repetitive tasks.

(Tr. 64).

In this regard, the decision in  Hess v. Comm'r Soc. Sec., 931 F.3d 198, 210–11 (3d Cir. 2019), is instructive. In Hess the court of appeals rejected any *per se* rule finding that simple task RFCs are legally inadequate to address moderate limitations in concentration, persistence, and pace. Instead, the court of appeals found that, in this setting, the issue was one of adequate articulation of the ALJ's rationale, holding that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess, 931 F.3d at 211. On this score, the appellate court indicated that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the

claimant] could do simple work; and [the claimant]'s activities of daily living, which demonstrated that he is capable of engaging in a diverse array of 'simple tasks[.]'" Id. at 214.

That is what happened here. Relying upon expert opinions, and considering Sensenig's activities of daily living, as well as the overall clinical record, the ALJ found that the plaintiff could perform simple tasks. This assessment was supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. There is no error here.

Sensenig's challenge to the ALJ's symptom evaluation is also unavailing. In conducting this assessment in it well-settled that:

> [A]n ALJ must conduct a two-step process in analyzing a claimant's pain or other symptoms. First, the ALJ must determine whether the claimant has "a medically determinable impairment that could reasonably be expected to produce [the claimant's] symptoms, such as pain." 20 C.F.R. § 404.1529(b). Second, when the record shows that the claimant has a "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms," the ALJ "must then evaluate the intensity and persistence of [the claimant's] symptoms" to determine how the symptoms limit the claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). "In evaluating the intensity and persistence" of a claimant's symptoms, the ALJ considers "all of the available evidence" from "medical sources and nonmedical sources" to determine how the symptoms affect the claimant. (Id.).

Stancavage v. Saul, 469 F. Supp. 3d 311, 336–37 (M.D. Pa. 2020).

In the instant case, the ALJ's symptom evaluation followed this analytical paradigm. Considering Sensenig's self-reported activities, the clinical record, and the medical opinion evidence, the ALJ reasonably concluded that Sensenig's symptoms were not wholly disabling. While Sensenig argues that this evaluation failed to adequately consider his work history, it is clear that:

> Although a claimant's work history is one of many factors the ALJ considers in assessing an individual's subjective complaints, 20 C.F.R. § 404.1529(c)(3), the ALJ is not required to equate a long work history with credibility. See Christl v. Astrue, 2008 WL 4425817, *12 (W.D.Pa. Sept.30, 2008). Thus, a claimant's work history alone is not dispositive of the question of . . . credibility.

Patton v. Astrue, No. CIV.A.08-205J, 2009 WL 2876715, at *3 (W.D. Pa. Sept. 8, 2009). Rather "[w]ork history 'is only one of many factors an ALJ may consider in assessing a claimant's subjective complaints.'" Sanborn v. Colvin, No. CIV.A. 13-224, 2014 WL 3900878, at *16 (E.D. Pa. Aug. 11, 2014), aff'd sub nom. Sanborn v. Comm'r of Soc. Sec., 613 F. App'x 171 (3d Cir. 2015). In the instant case, given the substantial body of clinical, opinion, and anecdotal evidence supporting the ALJ's decision, the ALJ was not obliged to reach a contrary conclusion based solely upon Sensenig's work history. There was no error here.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the

law requires, and all that a claimant can demand in a disability proceeding. Therefore, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: March 24, 2025